EAG:NS
F.#2013R00786

14 MISC 1117

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION OF                    SEALED APPLICATION
THE UNITED STATES OF AMERICA FOR AN
ORDER AUTHORIZING THE RELEASE OF
HISTORICAL CELL-SITE INFORMATION

- - - - - - - - - - - - - - - - - -X

       Nadia I. Shihata, an Assistant United States Attorney for the Eastern District of

New York, hereby applies to the Court for Orders pursuant to 18 U.S.C. § 2703(c)(1) and (d),

directing that within seven days Sprint (the "service provider") disclose (1) recorded

information identifying the base station towers and sectors that received transmissions from

(516) 423-1788, a telephone issued by the service provider and subscribed to by DENIS

NIKOLLA at 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213 ("SUBJECT

TELEPHONE 1"), at the beginning and the end of calls or text message transmissions, and the

mobile switching center serving SUBJECT TELEPHONE 1 during any calls or text message

transmissions, for the period from May 1, 2013 through August 23, 2013; and (2) recorded

information identifying the base station towers and sectors that received transmissions from

(516) 423-3813, a telephone issued by the service provider and subscribed to by DENIS

NIKOLLA at 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213 ("SUBJECT

TELEPHONE 2"), at the beginning and the end of calls or text message transmissions, and the

mobile switching center serving SUBJECT TELEPHONE 2 during any calls or text message

transmissions, for the period from August 1, 2013 through August 23, 2013[1] (collectively, the "HISTORICAL CELL-SITE INFORMATION").

In support of this application I state the following:

1.    I am an Assistant United States Attorney in the Office of Loretta E. Lynch, United States Attorney for the Eastern District of New York.   As such, I am a duly-authorized representative of a "governmental entity" under 18 U.S.C. § 2703(c) and (d) and, as such, am authorized to apply for Orders authorizing the disclosure of the HISTORICAL CELL-SITE INFORMATION.

2.    The Court is authorized to order the disclosure of the HISTORICAL CELL-SITE INFORMATION upon the government offering specific and articulable facts showing that there are reasonable grounds to believe that the information sought is relevant and material to an ongoing criminal investigation.   18 U.S.C. § 2703(d).

3.    I have discussed this matter with a Special Agent with the Federal Bureau of Investigation (the "investigative agency"), who is involved in the investigation. Based upon my discussion with the agent, I believe that the information likely to be obtained is relevant to an ongoing criminal investigation as required by 18 U.S.C. § 2703(d).   First, the investigative agency is conducting a criminal investigation into possible violations of federal criminal laws, including conspiracies to commit extortion and attempted extortions, in violation of 21 U.S.C. § 1951, and use of firearms in connection with these crimes of violence, in violation of 18 U.S.C. § 924(c), occurring in the Eastern District of New York.   Indeed, on July 17, 2014, a grand jury in the Eastern District of New York returned a second superseding

---

[1]    During the course of this investigation, the government previously sought and received historical cell site information relating to SUBJECT TELEPHONE 2 for the period from May 1, 2013 to August 1, 2013.   See 13 MISC 603.

2

indictment charging DENIS NIKOLLA, REDINEL DERVISHAJ, and BESNIK

LLAKATURA with, inter alia, (1) conspiracy to commit extortion and attempted extortion of

a restaurant in Queens, New York owned by John Doe #2, an individual whose identity is

known to your affiant, and use of a firearm in connection with these crimes of violence; (2)

conspiracy to commit extortion and attempted extortion of social clubs in Queens, New York

owned by John Doe #3, an individual whose identity is known to your affiant, and use of a

firearm in connection with these crimes of violence.[2]  See United States v. Dervishaj, et al.,

Criminal Docket No. 13-668 (S-2)(ENV).   Second, it is believed that DENIS NIKOLLA,

REDINEL DERVISHAJ, BESNIK LLAKATURA and others known and unknown, have

used the SUBJECT TELEPHONES in furtherance of the above offenses.   Third,

HISTORICAL CELL-SITE INFORMATION will further the investigation by corroborating

information received from witnesses and court-authorized interceptions of wire and electronic

communications during the investigation, including DENIS NIKOLLA's location during

meetings with his co-conspirators and interactions with the victims of the extortion

conspiracies and others.

   4. Based upon discussions with a special agent of the investigative agency,

the government hereby sets forth the following specific and articulable facts showing that there

are reasonable grounds to believe that the information sought is relevant and material to an

ongoing criminal investigation.

---

[2] The second superseding indictment also charges REDINEL DERVISHAJ and DENIS
NIKOLLA with extortion conspiracy and attempted extortion of one or more nightclubs
owned by John Doe #1, and use of a firearm in connection with these crimes of violence.

5.      All descriptions, summaries and transcripts of calls and text messages contained within this application are based on draft transcripts, translations, summaries and line sheets, which are subject to correction, and are not final transcripts or translations.

I.      Extortion of John Doe #2[3]

6.      John Doe #2, whose identity is known to your affiant, was raised in Albania and thereafter immigrated to the United States as an adult.   In 2013, John Doe #2 owned a pizzeria in Little Neck, New York (hereinafter, the "Queens Pizzeria") and a seafood restaurant in Astoria, New York (hereinafter, the "Astoria Restaurant").   John Doe #2 has advised the following, in substance and in part:

a.      On or about May 11, 2013 in the afternoon, an employee of the Queens Pizzeria informed John Doe #2 that a man had entered the Queens Pizzeria and asked to speak with John Doe #2.   John Doe #2 subsequently entered the dining area of the Queens Pizzeria and spoke with the man, an Albanian male, who introduced himself as "Redi from Durrsi."   Durrsi is a city in Albania.   During their conversation, "Redi" stated that (1) John Doe #2 would have to pay him because John Doe #2 had recently opened the Astoria Restaurant in "our neighborhood;" (2) if John Doe #2 did not know who "Redi" was, John Doe #2 should look him up;[4] and (3) "Redi" was going to send two men to the Astoria Restaurant that evening and John Doe #2 needed "to take care of them."

---

[3]      The facts set forth herein regarding the extortion of John Doe #2 are taken from the sworn affidavit of FBI Special Agent Sean Olsewski dated May 14, 2014 in support of a search warrant for various telephones seized during the investigation, including a cellular telephone seized from DENIS NIKOLLA's residence at the time of his arrest.   See 14 M 450.

[4]      A "Google" search for "Redinel Dervishaj" results in articles from various media outlets showing photographs of DERVISHAJ and revealing the following information regarding DERVISHAJ's involvement in a fatal stabbing: According to the news articles, in or

b.      Following this encounter, on or about May 11, 2013, John Doe #2 called (347) 392-0246 (hereinafter, the "LLAKATURA Cell Phone") and spoke with his friend, BESNIK LLAKATURA, a New York City Police Department ("NYPD") officer of Albanian descent.[5]   LLAKATURA advised John Doe #2 that he knew who "Redi" was, that "Redi" and others extort various Albanian establishments in Astoria and that John Doe #2 opened the Astoria Restaurant in "their neighborhood."

c.      John Doe #2 has known BESNIK LLAKATURA for many years and previously lived with LLAKATURA.   As a result, LLAKATURA knows personal details regarding John Doe #2, including John Doe #2's mobile telephone number and the fact that John Doe #2's brother-in-law lives in another state and owns a business there.

d.      On or about the evening of May 11, 2013, an employee of the Astoria Restaurant informed John Doe #2 that two men came to the Astoria Restaurant looking for John Doe #2 when John Doe #2 was not there.   At approximately 10:41 p.m., John Doe #2 received a call on his mobile telephone from a telephone number with area code 718 (hereinafter, "718 Telephone Number 1").[6]   According to John Doe #2, the person who called him from 718 Telephone Number 1 identified himself as "Redinel" and, in Albanian, reiterated

about March 2012, DERVISHAJ was arrested for stabbing Antonio Lacertosa with a butcher knife on Staten Island, New York, during Lacertosa's engagement party.   Lacertosa died from his injuries.   In or about April 2012, a Staten Island grand jury declined to indict DERVISHAJ for Lacertosa's murder, after viewing video surveillance footage of events leading up to the stabbing, which DERVISHAJ's counsel argued showed DERVISHAJ acted in self-defense.

[5]      Telephone records indicate that the LLAKATURA Cell Phone is a cellular telephone subscribed to by BESNIK LLAKATURA at 186 Jefferson Avenue, Staten Island, New York 10306.

[6]      Records checks reveal that 718 Telephone Number 1 belongs to a pay phone located in Astoria, New York.

that John Doe #2 had opened his restaurant in "our neighborhood" and, as a result, John Doe #2 would have to pay "us."

        e.      Prior to May 11, 2013, John Doe #2 had never met "Redi."   At no point during their May 11, 2013 encounter did John Doe #2 provide "Redi" with his mobile telephone number.

        7.      During the course of the investigation, John Doe #2 identified a photograph of REDINEL DERVISHAJ as the individual who introduced himself to John Doe #2 as "Redi from Durrsi" on May 11, 2013.

        8.      Video surveillance footage captured by security cameras installed within the Queens Pizzeria corroborates John Doe #2's account of what transpired on the afternoon of May 11, 2013.   The video surveillance footage shows a man entering the Queens Pizzeria at approximately 3:47 p.m.[7] and speaking with an employee behind the pizza counter.   The employee then walks away.   Approximately 25 seconds later, John Doe #2 enters the dining area from the back of the Queens Pizzeria and speaks with the man who had entered.   John Doe #2 and the man sit together at a table in the Queens Pizzeria for a short time, after which the man exits the Queens Pizzeria.   Telephone records also confirm that John Doe #2 called the LLAKATURA Cell Phone at approximately 3:53 p.m. on May 11, 2013.

        9.      Telephone number (571) 337-7018 is a cellular telephone subscribed to by REDINEL DERVISHAJ (hereinafter, the "DERVISHAJ Cell Phone").

---

[7]     Analysis of the video surveillance footage from the Queens Pizzeria indicates that the time stamp from the footage is one hour behind the actual time (i.e., when the video footage indicates that it is 2:47 p.m., it is actually 3:47 p.m.).   Times set forth herein reflect the actual time.

10.     Telephone records reveal that the LLAKATURA Cell Phone was used to call the DERVISHAJ Cell Phone at approximately 3:13 p.m. on May 11, 2013 – approximately 34 minutes <u>before</u> DERVISHAJ visited the Queens Pizzeria on May 11, 2013 and approximately 40 minutes <u>before</u> John Doe #2 called LLAKATURA to inform him of the extortion threats made by DERVISHAJ.   Telephone records also reveal that the DERVISHAJ Cell Phone was used to call the LLAKATURA Cell Phone on May 11, 2013, after DERVISHAJ's visit to the Queens Pizzeria, at the following approximate times: 3:49 p.m., 5:58 p.m., 6:08 p.m., and 10:47 p.m.

11.     According to John Doe #2, on or about the evening of May 12, 2013, John Doe #2 closed the Queens Pizzeria, got into his vehicle and began driving home.   As John Doe #2 was driving, he noticed a white Chevy Malibu sedan (hereinafter, the "Chevy Malibu") following his vehicle.   Thereafter, John Doe #2 observed DERVISHAJ approach his vehicle and state the following, in Albanian, in substance and in part: "What happened? You think you're a tough guy?   You think you have balls of steel?   I want $4,000 for the restaurant per month."   DERVISHAJ further stated that John Doe #2's restaurant was going to be a "gold mine" and that John Doe #2 had to pay "us."   Later that night, John Doe #2 noticed the Chevy Malibu in the vicinity of the Astoria Restaurant.

12.     Telephone records reveal that (1) the DERVISHAJ Cell Phone was used to call the LLAKATURA Cell Phone at approximately 1:56 p.m. and 5:20 p.m. on May 12, 2013; and (2) the LLAKATURA Cell Phone was used to call the DERVISHAJ Cell Phone at approximately 8:29 p.m. on May 12, 2013.

13.     According to John Doe #2, on or about May 13, 2013, John Doe #2 met with LLAKATURA, at LLAKATURA's suggestion, in Astoria, New York.   According to

7

John Doe #2, during that meeting, LLAKATURA informed John Doe #2, in substance and in part, that (1) DERVISHAJ and his associates run Astoria and extort other businesses there; (2) DERVISHAJ and his associates knew about John Doe #2's family, including a family member who owned a liquor store in another state; (3) if John Doe #2 reported the extortionate threats he received to law enforcement, DERVISHAJ and his associates would physically harm John Doe #2; and (4) DERVISHAJ would pass by the Astoria Restaurant the next day.

14. According to John Doe #2, on or about May 14, 2013, at approximately 8:30 p.m., John Doe #2 noticed the Chevy Malibu on the streets of Astoria, Queens.   At approximately 10:30 p.m., John Doe #2 saw DERVISHAJ park the Chevy Malibu across the street from the Astoria Restaurant and walk towards the Astoria Restaurant.   Thereafter, DERVISHAJ again demanded money from John Doe #2.   John Doe #2 told DERVISHAJ that he was not making any money from the Astoria Restaurant, as he had not yet received his liquor license. DERVISHAJ nonetheless continued to demand payment, telling John Doe #2, in substance and in part, "you have to take care of us."   Telephone records reveal that the DERVISHAJ Cell Phone was used to call the LLAKATURA Cell Phone at approximately 8:04 p.m., 8:22 p.m., and 11:02 p.m. on May 14, 2013.   Based on my training and experience, and the timing of these calls, I believe that DERVISHAJ called LLAKATURA to discuss the extortion of John Doe #2.

15.     John Doe #2 has advised that he did not receive extortionate threats following the May 14, 2013 incident described above until in or about July 2013.   More specifically, John Doe #2 has advised the following, in substance and in part:

a.     On or about the evening of July 6, 2013, John Doe #2 closed up the Queens Pizzeria.   As John Doe #2 exited the Queens Pizzeria and proceeded towards his

vehicle, which was parked in a driveway behind the Queens Pizzeria, John Doe #2 noticed a

black Dodge Charger vehicle (hereinafter, the "Dodge Charger") also parked on a side street

behind the Queens Pizzeria.

      b.     John Doe #2 pulled out of the driveway and turned left onto the

street, at which point he noticed at least three men inside the Dodge Charger.   Thereafter, the

Dodge Charger began following John Doe #2's vehicle.   John Doe #2 noticed that the Dodge

Charger did not have a front license plate.

      c.     John Doe #2, who was driving on a narrow residential street,

subsequently attempted to make a U-turn in an effort to see the Dodge Charger's rear license

plate.   As John Doe #2 did so, his vehicle ended up nose-to-nose with the Dodge Charger, at

which point John Doe #2 reversed his vehicle for approximately half a block and attempted to

turn his vehicle around.   John Doe #2 was unable to turn his vehicle around, however, as his

vehicle was too close to a street pole on the corner.   At this point, the driver of the Dodge

Charger exited the Dodge Charger carrying a gun, ran towards John Doe #2's vehicle, and

pointed his gun at John Doe #2, while yelling at John Doe #2.   John Doe #2 managed to

escape the area and drove away.

      d.     John Doe #2 has identified a photograph of DENIS NIKOLLA as

the driver of the Dodge Charger who pointed a gun at John Doe #2 on July 6, 2013.

      16.     Video surveillance footage in and around the Queens Pizzeria shows that

John Doe #2 closed the Queens Pizzeria on July 6, 2013 at approximately 11:27 p.m.   Video

surveillance footage also shows that a black Dodge Charger drove by the Queens Pizzeria at

approximately 9:47 p.m., and was outside the front entrance of the Queens Pizzeria from

approximately 10:00 p.m. to 10:10 p.m.   Within the next hour, the video surveillance footage

further shows a black Dodge Charger drive by the Queens Pizzeria several times onto a side street.   The black Dodge Charger captured by the video surveillance footage had no front license plate.

17.    Records checks reveal that a black Dodge Charger is registered to DENIS NIKOLLA in Florida.   A check of the NYPD's Real-Time Crime Center License Plate Reader database indicates that NIKOLLA's Dodge Charger was captured on license plate reader cameras in New York City multiple times in July 2013.

18.    According to John Doe #2, shortly after the above-described incident with the Dodge Charger, at approximately 12:23 a.m. on July 7, 2013, John Doe #2 received a phone call on his mobile telephone from DERVISHAJ, using a telephone number beginning with area code 718 (hereinafter, "718 Telephone Number 2").[8]   According to John Doe #2, DERVISHAJ informed John Doe #2,   in Albanian and in substance and in part, that DERVISHAJ had not forgotten about John Doe #2, that he knew what was going on and that John Doe #2 "got lucky this time."

19.    Telephone records indicate that the SUBJECT TELEPHONE 2 is a mobile telephone issued by Sprint and subscribed to by DENIS NIKOLLA at 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213.   Telephone records further show that on July 6, 2013 – the date that NIKOLLA displayed a gun to John Doe #2 – SUBJECT TELEPHONE 2 was in contact with the DERVISHAJ Cell Phone leading up to the gun incident at the following approximate times: 2:49 p.m., 2:50 p.m., 3:04 p.m., 6:24 p.m., 6:57 p.m., 7:31 p.m., and 8:36 p.m.   Telephone records also show that SUBJECT TELEPHONE 2

---

[8]    Telephone records reveal that 718 Telephone Number 2 belongs to a pay phone located in Astoria, New York, located approximately 0.6 miles from the Astoria Restaurant.

was in contact with the DERVISHAJ Cell Phone following DERVISHAJ's 12:23 a.m. call with John Doe #2 on July 7, 2013 at the following approximate times: 3:56 a.m., 7:55 p.m., 8:04 p.m., 8:25 p.m., 8:35 p.m., and 10:43 p.m.

20.     At approximately 6:33 p.m. on July 7, 2013, LLAKATURA sent John Doe #2 a text message from the LLAKATURA Cell Phone, which stated "U are in deep shit u know.  I dont want ur problems to become mine."  Telephone records further reveal that (1) the DERVISHAJ Cell Phone was used to call the LLAKATURA Cell Phone at approximately 1:32 p.m., 3:12 p.m., 4:44 p.m., 4:51 p.m., 8:26 p.m., 9:05 p.m., and 10:01 p.m. on July 7, 2013; and (2) the LLAKATURA Cell Phone was used to call the DERVISHAJ Cell Phone at approximately 9:49 p.m. on July 7, 2013.

21.     On or about July 8, 2013, at approximately 9:46 p.m., John Doe #2 called LLAKATURA on the LLAKATURA Cell Phone, which call was consensually recorded.[9]  A review of the recording reveals that, during this call, LLAKATURA asked John Doe #2 what happened.   John Doe #2 told LLAKATURA he did not know what to do and that "they" showed up with weapons.   LLAKATURA asked John Doe #2 where he was and John Doe #2 indicated he was in New Jersey.   LLAKATURA advised John Doe #2 to stay in New Jersey and not to come to New York until tomorrow.   LLAKATURA further advised John Doe #2 that he would be in Astoria tomorrow and would see what to do then.

22.     Telephone records reveal that the DERVISHAJ Cell Phone was used to call the LLAKATURA Cell Phone at approximately 1:42 p.m., 2:15 p.m., and 5:59 p.m. on July 8, 2013.

---

[9]     All consensually recorded calls between John Doe #2 and LLAKATURA and DERVISHAJ set forth herein were consensually recorded and verified using an FBI system.

23.    At approximately 1:08 a.m. on July 9, 2013, John Doe #2 received a text message on his mobile telephone from LLAKATURA, using the LLAKATURA Cell Phone, which text message was viewed by law enforcement agents and which telephone records confirm was sent from the LLAKATURA Cell Phone.   The text message advised John Doe #2 to tell the manager of the Astoria Restaurant to be careful tomorrow and not to be by himself.   Based on my participation in the investigation, and my training and experience, I believe this text message was meant to convey to John Doe #2 that DERVISHAJ and his associates intended to physically harm the manager of the Astoria Restaurant.

24. On or about July 9, 2013, at approximately 10:19 a.m., John Doe #2 received a text message on his mobile telephone from LLAKATURA, using the LLAKATURA Cell Phone, asking John Doe #2 to meet him in Staten Island, New York.   This text message has been viewed by law enforcement agents and telephone records confirm the time and sender of the text message.   Thereafter, telephone records indicate that John Doe #2 spoke with LLAKATURA on the LLAKATURA Cell Phone.   According to John Doe #2, during their conversation, LLAKATURA provided John Doe #2 with an address in Staten Island at which John Doe #2 could meet LLAKATURA and, further, that "they" had another "crew" following John Doe #2 around and that they were "bad people."   On or about the afternoon of July 9, 2013, John Doe #2 met with LLAKATURA in Staten Island, New York, which meeting was physically surveilled by law enforcement agents.[10]   John Doe #2 advised that the following transpired at the meeting, in substance and in part:

---

[10]    John Doe #2 was equipped with a recording device during this meeting, but the recording device malfunctioned and, as a result, the meeting was not recorded.

    a.      LLAKATURA advised John Doe #2 that he was in a bad situation and that the individuals extorting John Doe #2 were bad people who could not be fought because they would hurt John Doe #2.

    b.      LLAKATURA further advised that, on or about July 8, 2013, DERVISHAJ came to LLAKATURA's residence with two friends, one of whom was an individual LLAKATURA knew as "Altin," to discuss the amount of money they wanted from John Doe #2. LLAKATURA stated that DERVISHAJ wanted three months' payment from John Doe #2, for the three months the Astoria Restaurant had been open, totaling $12,000, by July 11, 2013. LLAKATURA told John Doe #2 that if John Doe #2 did not pay, John Doe #2 would be physically harmed. LLAKATURA further stated that the individuals extorting John Doe #2 had intended to wound John Doe #2 by shooting him on the evening of July 6, 2013.

    c.      John Doe #2 told LLAKATURA that he could not come up with $12,000 by July 11, 2013, and would only be able to pay $4,000 by that date. LLAKATURA stated that he would speak with "them" and get back to John Doe #2.

    25.      At approximately 7:48 p.m. on July 9, 2013, LLAKATURA sent a text message from the LLAKATURA Cell Phone to John Doe #2 stating "U have no problem do ur things," which text message was reviewed by law enforcement agents and which telephone records confirm was sent from the LLAKATURA Cell Phone.

    26.      Telephone records indicate that, at approximately 10:41 p.m. on July 9, 2013, John Doe #2 received a telephone call on his mobile phone from the LLAKATURA Cell Phone. According to John Doe #2, during this phone call, LLAKATURA indicated that he was a few blocks away from the Astoria Restaurant and was going to pass by, which LLAKATURA thereafter did. Video surveillance footage in and around the Astoria

Restaurant shows LLAKATURA arriving at the Astoria Restaurant at approximately 10:44

p.m. and thereafter speaking with John Doe #2 outside the Astoria Restaurant.   John Doe #2

related that the following transpired during his meeting with LLAKATURA, in substance and

in part:

        a.      LLAKATURA related that two Albanian men had come to see

LLAKATURA and told LLAKATURA that they had been sent by DERVISHAJ.

        b.      According to LLAKATURA, one of the Albanian men then called

DERVISHAJ from his mobile telephone and handed the phone to LLAKATURA.

LLAKATURA indicated that DERVISHAJ told LLAKATURA that John Doe #2 must pay

DERVISHAJ $6,000 by July 11, 2013 and another $6,000 by August 15, 2013, otherwise

DERVISHAJ would break John Doe #2's legs.   LLAKATURA offered to loan John Doe #2

$2,000 towards the $6,000 payment to DERVISHAJ due on July 11, 2013.

        27.      Telephone records reveal that (1) the DERVISHAJ Cell Phone was used

to call the LLAKATURA Cell Phone at approximately 3:42 p.m., 3:53 p.m., 9:06 p.m., and

9:09 p.m. on July 9, 2013; and (2) the LLAKATURA Cell Phone was used to call the

DERVISHAJ Cell Phone at approximately 6:50 p.m., 8:32 p.m., 8:59 p.m., 9:00 p.m., and

11:39 p.m. on July 9, 2013.

        28.      On or about July 10, 2013 at approximately 6:08 p.m., John Doe #2

called LLAKATURA on the LLAKATURA Cell Phone, which call was consensually

recorded.   A review of the recording reveals that, during this phone call, LLAKATURA

asked John Doe #2 whether John Doe #2 would make the cash payment to DERVISHAJ

himself or whether LLAKATURA should do so instead.   John Doe #2 stated that he wanted to

meet DERVISHAJ face-to-face.   LLAKATURA stated that he also wanted to be present at

the meeting with DERVISHAJ and advised John Doe #2 to meet LLAKATURA the next day in the afternoon.

29.     At approximately 7:11 p.m. on July 10, 2013, John Doe #2 called the LLAKATURA Cell Phone and spoke with LLAKATURA, which call was consensually recorded. A review of the recording reveals that, during the phone call, LLAKATURA and John Doe #2 discussed whether to meet with DERVISHAJ later that night or the next day. LLAKATURA told John Doe #2 that he would provide him with a $2,000 loan when they met, but that John Doe #2 would need to provide the rest of the money ($4,000). LLAKATURA and John Doe #2 ultimately agreed to meet the next day after LLAKATURA got off from work, in Astoria, New York.

30.     Telephone records reveal that (1) the DERVISHAJ Cell Phone was used to call the LLAKATURA Cell Phone at approximately 4:57 p.m., 5:02 p.m., 5:05 p.m., and 7:32 p.m. on July 10, 2013; and (2) the LLAKATURA Cell Phone was used to call the DERVISHAJ Cell Phone at approximately 5:54 p.m. and 6:15 p.m. on July 10, 2013.

31. On or about July 11, 2013 at approximately 11:33 a.m., John Doe #2 called the LLAKATURA Cell Phone and spoke with LLAKATURA, which call was consensually recorded. A review of the recording reveals that, during the call, John Doe #2 expressed concern over his safety and asked LLAKATURA if he could meet with LLAKATURA. LLAKATURA told John Doe #2 that they could meet later in the day, five minutes before the meeting with DERVISHAJ, to go over any concerns John Doe #2 had. LLAKATURA stated that he would make sure nothing happened to John Doe #2 during the meeting with DERVISHAJ. LLAKATURA ultimately agreed to meet with John Doe #2 briefly in Staten Island, New York.

32.     On or about July 11, 2013 in the afternoon, John Doe #2 met with

LLAKATURA in Staten Island, New York, which meeting was consensually recorded.   John

Doe #2 advised that the following transpired during the meeting, in substance and in part:

a.     LLAKATURA told John Doe #2 that John Doe #2 could open up

a club with DERVISHAJ.   LLAKATURA advised that the club would be in John Doe #2's

name, but DERVISHAJ would be a partner in the club.   In the event this transpired,

LLAKATURA told John Doe #2 that for every $2,000 John Doe #2 made from the club, John

Doe #2 would have to give DERVISHAJ $1,000.

b.     LLAKATURA stated that he had spoken with DERVISHAJ and

that, as long as John Doe #2 paid DERVISHAJ, John Doe #2 would be fine.

c.     LLAKATURA stated that DERVISHAJ would search John Doe

#2 when they met with DERVISHAJ later that night and that DERVISHAJ expected another

$6,000 payment by August 15, 2013.

d.     While discussing possible options with John Doe #2,

LLAKATURA told John Doe #2 that if he went into witness protection, DERVISHAJ and his

associates would hurt members of John Doe #2's family who reside in another state, and asked

John Doe #2 what type of car John Doe #2's brother-in-law has.

33.     A review of the recording of John Doe #2's meeting with LLAKATURA

on the afternoon of July 11, 2013 corroborates John Doe #2's account of what transpired.   In

addition, the recording reveals that, during the meeting, LLAKATURA told John Doe #2 that

DERVISHAJ would not call John Doe #2 because DERVISHAJ is worried that John Doe #2

might have the police involved.   LLAKATURA further indicated that he told DERVISHAJ to

search John Doe #2 when they meet.

34.     Law enforcement agents conducted physical surveillance of DERVISHAJ on July 11, 2013, during which they observed DERVISHAJ driving the Chevy Malibu.   At approximately 5:49 p.m., law enforcement agents observed DERVISHAJ in Astoria, New York standing in front of the Chevy Malibu, speaking with an unidentified man, later identified as LLAKATURA.

35.     Shortly thereafter, on or about the evening of July 11, 2013, John Doe #2 met with LLAKATURA in Astoria, New York, which meeting was physically surveilled and partially consensually recorded.   According to the physical surveillance, John Doe #2 entered LLAKATURA's vehicle at approximately 6:03 p.m.   John Doe #2 advised that the following transpired during the meeting, in substance and in part:

a.     John Doe #2 entered LLAKATURA's vehicle, at which point LLAKATURA handed John Doe #2 $2,000 in cash.   LLAKATURA subsequently received a telephone call on his mobile phone from DERVISHAJ, during which John Doe #2 overheard DERVISHAJ telling LLAKATURA where to meet him.   Following this phone call, LLAKATURA and John Doe #2 proceeded to meet with DERVISHAJ in Astoria, New York on an isolated street corner.[11]   John Doe #2 was told to take everything out of his pockets and leave these items in LLAKATURA's vehicle.

b.     At the start of the meeting with DERVISHAJ, DERVISHAJ searched both John Doe #2 and LLAKATURA.   DERVISHAJ then asked John Doe #2 what he had to say for himself.   LLAKATURA told John Doe #2 to give DERVISHAJ the money,

---

[11]     A review of the recording corroborates John Doe #2's account of what transpired. The recording captures DERVISHAJ's voice telling LLAKATURA where they should meet.   In addition, telephone records indicate that the LLAKATURA Cell Phone received an incoming call from the DERVISHAJ Cell Phone at approximately 6:07 p.m. on July 11, 2013.

at which point DERVISHAJ gestured to slow down and asked John Doe #2 to get into DERVISHAJ's car – the Chevy Malibu – with DERVISHAJ. LLAKATURA remained outside the Chevy Malibu.

        c.      While inside the Chevy Malibu, DERVISHAJ told John Doe #2 that he was lucky the other night and that John Doe #2 and the manager of the Astoria Restaurant should thank LLAKATURA. John Doe #2 then handed DERVISHAJ $6,000 in cash,[12] at which point DERVISHAJ inquired about the rest of the money. John Doe #2 indicated that he was told he had until August 15, 2013 to come up with the rest of the money.

        d.      DERVISHAJ stated that, in the future, he would give John Doe #2 his telephone number, which John Doe #2 could use to contact DERVISHAJ, in the event John Doe #2 needed protection and also to make payments to DERVISHAJ. John Doe #2 then left the meeting location with LLAKATURA.

        36.      According to John Doe #2, on or about August 14, 2013, at approximately 3:45 p.m., John Doe #2 received a telephone call from DERVISHAJ, calling from phone number (646) 894-7578. According to John Doe #2, DERVISHAJ provided him with (646) 894-7578 as his phone number (hereinafter, the "DERVISHAJ 646 Number").

        37.      On August 16, 2013, at approximately 4:18 p.m., John Doe #2 called the DERVISHAJ 646 Number, which call was consensually recorded. A review of the recording reveals that, during the call, John Doe #2 asked DERVISHAJ if he would come to the Queens Pizzeria to receive an extortion payment from John Doe #2. DERVISHAJ stated he was in New Jersey, but would call John Doe #2 when he was back in New York. At approximately

---

[12]    The government provided John Doe #2 with $4,000 in cash to provide to DERVISHAJ in advance of the July 11, 2013 meeting.

7:04 p.m., John Doe #2 called the DERVISHAJ 646 Number again, which call was

consensually recorded.   A review of the consensual recording reveals that, during the call,

DERVISHAJ indicated he had returned from New Jersey and would go meet John Doe #2 at

the Queens Pizzeria.   Thereafter, an FBI surveillance team followed DERVISHAJ as he drove

from his residence in Queens to the Queens Pizzeria.   According to the surveillance team,

DERVISHAJ drove past the Queens Pizzeria, but did not exit his vehicle and enter the

pizzeria.

        38.    At approximately 8:14 p.m. the same evening, DERVISHAJ placed an

outgoing call on the DERVISHAJ Cell Phone (Session 563) to the LLAKATURA Cell Phone,

which call was intercepted pursuant to a court-authorized wiretap on the DERVISHAJ Cell

Phone.   During the call, DERVISHAJ appears to advise LLAKATURA that he has turned off

his "other phone" because his meeting with John Doe #2 may be a "set-up."

        39.    At approximately 9:07 p.m. that evening, John Doe #2 called the

DERVISHAJ 646 Number, which call was consensually recorded.   The call went to

voicemail and John Doe #2 left DERVISHAJ a message asking DERVISHAJ whether he was

coming and indicating that DERVISHAJ should call him, as he would be leaving the Queens

Pizzeria.

        40.    At approximately 9:25 p.m., John Doe #2 called the LLAKATURA Cell

Phone, which call was consensually recorded.   The call went to voicemail and John Doe #2

left a message asking LLAKATURA to call him.   At approximately 9:30 p.m., John Doe #2

received a call from the LLAKATURA Cell Phone.   According to John Doe #2, during the

call, John Doe #2 told LLAKATURA, in sum and substance, that DERVISHAJ was supposed

to pick up the extortion payment, but now was not answering his phone and John Doe #2 did

not know what to do.    LLAKATURA asked John Doe #2 where he was and whether he would
come to Astoria.    John Doe #2 indicated he would come to Astoria after work.
LLAKATURA asked John Doe #2 to call him when he was in Astoria.

       41.     Approximately half an hour later, at 9:59 p.m., DERVISHAJ received an
incoming call on the DERVISHAJ Cell Phone (Session 569) from the LLAKATURA Cell
Phone, which call was intercepted pursuant to a court-authorized wiretap on the DERVISHAJ
Cell Phone.    During the call, LLAKATURA appears to inform DERVISHAJ, in coded
language, about his 9:30 p.m. call with John Doe #2, described above:

> BL:    That bitch called me.
>
> RD:    Uh-huh.
>
> BL:    You know for what.
>
> RD:    Yes.
>
> BL:    Said why, meaning "why she doesn't want to go out with me?"   Do you
> understand?   For that—
>
> RD:    Uh-huh.
>
> BL:    I said if there was anything, I will meet you instead of him.
>
> RD:    Uh-huh.   What did he say?
>
> BL:    Yeah.
>
> RD:    He said okay?
>
> BL:    Yeah.
>
> RD:    Okay, okay.
>
> BL:    Okay.   If there is anything then.   Just look, you know how—
>
> RD:    Yeah, yeah.

BL:     Okay?

RD:     I'll check things myself.

BL:     Okay. . Look, if she has information that she is being followed, good bye—

RD:     Uh-huh.

BL:     Do it like I told you and tell me right away.

RD:     Okay.

BL:     Okay?  Slowly.

42.     On August 17, 2013, at approximately 4:45 p.m. and 5:13 p.m., John Doe #2 received two calls from the DERVISHAJ 646 Number, which John Doe #2 did not answer.   At 6:04 p.m., DERVISHAJ received an incoming call on the DERVISHAJ Cell Phone (Session 591) from the LLAKATURA Cell Phone, which call was intercepted pursuant to a court-authorized wiretap on the DERVISHAJ Cell Phone.   During the call, DERVISHAJ appears to complain to LLAKATURA that John Doe #2 is not answering his phone calls.

43.     Thereafter, John Doe #2 received four more incoming calls from the DERVISHAJ 646 Number at the following approximate times on August 17, 2013: 7:59 p.m., 8:03 p.m., 9:15 p.m., and 9:28 p.m.   John Doe #2 did not answer any of these calls.

44.     On August 18, 2013, at approximately 11:51 a.m., John Doe #2 received an incoming call from the DERVISHAJ 646 Number, which he did not answer.   At approximately 12:27 p.m., John Doe #2 called the DERVISHAJ 646 Number, which call was consensually recorded.   A review of the recording reveals that, during the call, DERVISHAJ complained that John Doe #2's phone did not work:

RD:     Your phone doesn't work?

21

JD#2: But I have also not been feeling well.   I have been throwing up and stuff.

RD:    *Okay.*

JD#2: What are you doing?

RD:    Not much.

JD#2: I waited for you on Friday *man.*

RD:    Huh?

JD#2: I am saying that I waited for you on Friday.   You did not come.

RD:    *Yeah* I did not come because I was busy.

JD#2: Uh-huh.   When will you come now?

RD:    Huh?

JD#2: I am saying, when will you come?

RD:    When will I come now?   God willing when I have time I will come and meet you, *okay*?

JD#2: *Alright.*   I come back tomorrow, if so—

RD:    Okay, good.   God willing.

JD#2: Good night then.   Ciao.

45.    On or about August 20, 2013 at approximately 9:40 p.m., John Doe #2 met with LLAKATURA in Astoria, New York to make an extortion payment, which meeting was consensually recorded.   A review of the recording reveals that at the beginning of the meeting, LLAKATURA asked John Doe #2 whether he had his phone with him.   John Doe #2 stated that he left his phone in his car.   LLAKATURA then stated "come here, open your arms," at which point, according to John Doe #2, LLAKATURA patted John Doe #2 down. The recording further reveals that, during the meeting, LLAKATURA told John Doe #2, in

sum, substance and in part, that (1) DERVISHAJ told LLAKATURA that the night

DERVISHAJ was supposed to meet John Doe #2 at the pizzeria, DERVISHAJ was followed

by "two FBI cars;" (2) DERVISHAJ suspected he was followed because of John Doe #2; and

(3)   LLAKATURA explained to DERVISHAJ that John Doe #2 would not go to law

enforcement because John Doe #2 has family in the United States and Albania.

LLAKATURA further warned John Doe #2 that "they are motherfuckers" and that "if

something happens to him [DERVISHAJ], fuck it, they are animals."   LLAKATURA also

reported that DERVISHAJ said "he will not go to jail" and that John Doe #2 should know that

DERVISHAJ will not "just let it go" if something happens to DERVISHAJ.   After John Doe

#2 denied any involvement with law enforcement, LLAKATURA offered to accept John Doe

#2's extortion payments going forward if John Doe #2 was afraid to pay DERVISHAJ himself.

During the meeting, LLAKATURA accepted a $6,000 payment from John Doe #2[13] and told

John Doe #2 that he would not have any problems with DERVISHAJ since he was making

payments.   Throughout the conversation, LLAKATURA expressed concern about getting

involved with DERVISHAJ, indicating that he could lose his job or end up in jail by receiving

phone calls from DERVISHAJ.

      46.   On September 16, 2013, at approximately 9:17 p.m., video surveillance

from the pole camera installed outside of the Queens Pizzeria captured NIKOLLA entering the

Queens Pizzeria.   According to John Doe #2, after entering the Queens Pizzeria, NIKOLLA,

in sum and substance, asked John Doe #2 for another payment and John Doe #2 told

NIKOLLA that he would have the money in two days, namely, on September 18, 2013.

---

[13]   The government provided John Doe #2 with $6,000 in cash to provide to
LLAKATURA in advance of the August 20, 2013 meeting.

NIKOLLA then told John Doe #2 that he needed to make a call.   Video surveillance from the

pole camera captured NIKOLLA leaving the Queens Pizzeria.   Moments later, the

DERVISHAJ Cell Phone received an incoming call from 917-391-3326, a mobile telephone

that agents from the investigative agency believe was used by NIKOLLA (the "NIKOLLA 917

TELEPHONE").[14]   After the call was placed, NIKOLLA went back into John Doe #2's

restaurant.   Video surveillance footage from cameras inside the Queens Pizzeria captures

NIKOLLA inside the Queens Pizzeria speaking with John Doe #2 both before and after the

telephone call to the DERVISHAJ Cell Phone.   According to John Doe #2, when NIKOLLA

came back inside the Queens Pizzeria, he informed John Doe #2 that he would be back in two

days and that John Doe #2 should not call him.   Video surveillance from the pole camera

again captured NIKOLLA leaving the Queens Pizzeria, and moments later, the DERVISHAJ

Cell Phone received another incoming call from the NIKOLLA 917 TELEPHONE.   Agents

from the investigative agency believe that the NIKOLLA 917 TELEPHONE was being used

by NIKOLLA based on the timing of the calls to the DERVISHAJ Cell Phone immediately

following NIKOLLA's conversations with John Doe #2, as well as the fact that the NIKOLLA

917 TELEPHONE was seen on an advertisement for an escort service that agents from the

investigative agency believe, based on their training, experience and participation in the

investigation, was operated by NIKOLLA.

     47.     On September 19, 2013, at approximately 8:15 p.m., NIKOLLA went to

the Queens Pizzeria to collect the payment.   Video surveillance from the pole camera outside

---

[14]     Interceptions pursuant to the initial court-authorized wiretap on the DERVISHAJ Cell
Phone had ceased at this time.   Interceptions pursuant to a subsequent court-authorized
wiretap of the DERVISHAJ Cell Phone did not begin until September 17, 2013.   As a result,
this call was not intercepted.

the Queens Pizzeria recorded NIKOLLA entering the Queens Pizzeria.   A review of a

consensual recording of the meeting between John Doe #2 and NIKOLLA reveals that, during

the meeting, NIKOLLA stated, "give me that money because I don't have too much time.   I

have to go."   John Doe #2 then paid NIKOLLA $4,000.[15]

48.     On October 11, 2013, at approximately 6:32 p.m., John Doe #2 called

the LLAKATURA Cell Phone (Session 4663), which call was intercepted pursuant to a

court-authorized wiretap of the LLAKATURA Cell Phone.   During the call, John Doe #2

inquired about the upcoming extortion payment he owed and indicated that business had been

slow.   LLAKATURA claimed he did not know anything and could not do anything.   He

further stated that he did not talk over the phone, but indicated he would be in Astoria later

with a friend.

49.     On October 15, 2013, at approximately 7:07 p.m., LLAKATURA made

an outgoing call using the LLAKATURA Cell Phone (Session 5326) to the DERVISHAJ Cell

Phone, which call was intercepted pursuant to court-authorized wiretaps on both phones.

During the call, DERVISHAJ inquired whether LLAKATURA had spoken with John Doe #2:

> RD:   Ha-have you spoken to, to the friend?
>
> BL:   Yes.   [pause]   Uh?
>
> RD:   So I don't need to, to go and meet him?
>
> BL:   No, no, it is necessary.   It is necessary.
>
> RD:   It is necessary?
>
> BL:   Yeah.   Wha, what did we agree on, at the beginning! Then…

---

[15]     The government had previously provided John Doe #2 with the $4,000 payment he
made to NIKOLLA.

RD:    Um-hum.

BL:    You know?

RD:    Ha, okay.   [pause]   Well then.

BL:    Okay?   Let me know if [UI].

RD:    Okay.   Okay Bye.

BL:    If she, she does not see how – what you are made of—

RD:    [Overlapping conversation]   Yeah, yeah.

BL:    -- she [UI] beautifully, understand?

RD:    Uh-huh.

BL:    Okay?

RD:    Okay.

BL:    And then, you know what to do.

RD:    Okay.   Okay, then.

50.    That same evening, at approximately 8:30 p.m., video surveillance from the pole camera outside the Queens Pizzeria captured DERVISHAJ entering the Queens Pizzeria.   While inside the Queens Pizzeria, DERVISHAJ spoke with John Doe #2, which conversation was consensually recorded.   According to John Doe #2, during the conversation, DERVISHAJ indicated he was upset with the way John Doe #2 had been acting and, in sum and substance, informed John Doe #2 that he should make the next extortion payment to LLAKATURA.   Thereafter, John Doe #2 observed DERVISHAJ exit the Queens Pizzeria and enter a Black Dodge Charger as a passenger.

51.     On or about October 16, 2013, at approximately 8:30 p.m., John Doe #2 met with LLAKATURA in Queens, New York, which meeting was consensually recorded. During the meeting, John Doe #2 provided LLAKATURA with a $4,000 extortion payment.[16]

52.     On November 13, 2013, at approximately 3:55 p.m., LLAKATURA received an incoming call on the LLAKATURA Cell Phone from John Doe #2 (Session 9208), which call was intercepted pursuant to a court-authorized wiretap on the LLAKATURA Cell Phone.   During the call, John Doe #2 asked LLAKATURA when he would make the next extortion payment to LLAKATURA, to which LLAKATURA responded, "what's today? It's early."   LLAKATURA then indicated he would call John Doe #2 back.

53.     On November 14, 2013, at approximately 5:06 p.m., LLAKATURA used the LLAKATURA Cell Phone to call the DERVISHAJ Cell Phone (Session 9446), which call was intercepted pursuant to court-authorized wiretaps on both phones.   During the call, LLAKATURA informed DERVISHAJ that "your girlfriend called on the phone," referring to John Doe #2.   LLAKATURA subsequently informed DERVISHAJ that he would call DERVISHAJ when he arrived in Queens, New York and that he did not have much time. LLAKATURA and DERVISHAJ agreed that they would meet with John Doe #2 quickly to collect payment.

54.     Thereafter, on the evening of November 14, 2013, John Doe #2 met with LLAKATURA and DERVISHAJ in Queens, New York, which meeting was consensually

---

[16]     The government provided John Doe #2 with the $4,000 payment before the meeting.

recorded.   During the meeting, John Doe #2 provided DERVISHAJ with a $4,000 extortion payment.[17]

## II.   EXTORTION OF JOHN DOE #3

55.     With respect to the extortion conspiracy and attempted extortion of John Doe #3, the investigation has revealed, among other things, the following.   John Doe #3, whose identity is known to your affiant, has testified before a grand jury in the Eastern District of New York.   A review of John Doe #3's grand jury testimony reveals the following in sum, substance and in part:

a.     John Doe #3 is originally from Cyprus, but resides in New York. In the summer of 2013, John Doe #3 owned a real estate business and operated two social clubs in Astoria, New York (hereinafter, "Social Club 1" and "Social Club 2").   Among other things, gambling occurred at Social Club 1 and Social Club 2.

b.     During the summer of 2013, DENIS NIKOLLA and an individual whom John Doe #3 knew as "Red," came to Social Club 1 and spoke with John Doe #3 regarding "Red's" desire to rent an apartment.   John Doe #3 has identified photographs of DENIS NIKOLLA and REDINEL DERVISHAJ as the two individuals who came to speak with him on this occasion.   Thereafter, John Doe #3 accompanied REDINEL DERVISHAJ and others to view an apartment for rent.   REDINEL DERVISHAJ chose not to rent the apartment.

c.     Approximately a week after John Doe #3 accompanied REDINEL DERVISHAJ to see the apartment, DENIS NIKOLLA came to Social Club 1 and asked to speak with John Doe #3 in private.   During their subsequent conversation, DENIS

---

[17]     The government provided John Doe #2 with the $4,000 payment before the meeting.

NIKOLLA sought payments of $1,000 from John Doe #3 on a weekly basis.   DENIS NIKOLLA told John Doe #3 that if John Doe #3 made the demanded payments, John Doe #3 would not need to fear anyone and NIKOLLA would protect him.   John Doe #3 declined to make the demanded payments.   In response, NIKOLLA insisted that John Doe #3 think about the situation and stated that he would call John Doe #3 the following day.

        d.      Following this encounter, John Doe #3 ceased going to Social Club 1 because he feared for his safety.   During this time period, John Doe #3 heard from others that DENIS NIKOLLA and REDINEL DERVISHAJ were looking for John Doe #3.

        e.      In approximately July 2013, John Doe #3 encountered a friend – John Doe #4.   At the time, John Doe #4 had an injury to his face.   John Doe #4 informed John Doe #3 that DENIS NIKOLLA, REDINEL DERVISHAJ and a third individual had caused this injury.   John Doe #3 then began making arrangements to leave New York and fly to Cyprus because he feared for his safety.

        f.      In early August 2013, while at the airport awaiting his outbound flight from New York, John Doe #3 received a phone call from the manager of Social Club 2 (hereinafter, "the Manager").   The Manager informed John Doe #3 that DENIS NIKOLLA and others went to Social Club 2 and demanded that the Manager close Social Club 2.   John Doe #3 told the Manager to close Social Club 2.

        g.      John Doe #3 returned to New York in early September 2013. Social Club 2 remained closed while John Doe #3 was in Cyprus.   John Doe #3 did not reopen Social Club 2 after he returned to New York.

56.     John Doe #4, whose identity is known to your affiant, testified before a grand jury in the Eastern District of New York.   A review of John Doe #4's grand jury testimony reveals the following in sum, substance and in part:

a.      John Doe #3 and John Doe #4 are friends.   John Doe #4 has frequented Social Club 1 and Social Club 2.

b.      In the spring or summer of 2013, an individual John Doe #4 knows as "Denis" asked John Doe #4 about getting an apartment for his friend "Red."   John Doe #4 then spoke with John Doe #3 about this because John Doe #3 owns a real estate business.   Thereafter, John Doe #4 accompanied John Doe #3, "Red" and others to view a potential apartment for "Red."   John Doe #4 has identified a photograph of DENIS NIKOLLA as "Denis" and a photograph of REDINEL DERVISHAJ as "Red."

c.      Sometime after viewing the apartment, John Doe #4 observed DENIS NIKOLLA come into one of John Doe #3's social clubs and speak with John Doe #3.

d.      Sometime thereafter, while at Social Club 2, an employee at Social Club 2 informed John Doe #4 that some men had come to Social Club 2 and were looking for John Doe #3.   John Doe #4 then attempted to call John Doe #3, but John Doe #3 did not answer his phone.   John Doe #4 then left Social Club 2 and walked to John Doe #3's real estate office, which was a few blocks away, and found that the office was closed.   Shortly thereafter, John Doe #4 noticed DENIS NIKOLLA's black Dodge Charger double-parked in the vicinity of John Doe #3's real estate office.   John Doe #4 observed DENIS NIKOLLA in the driver's seat, REDINEL DERVISHAJ in the front passenger seat and a third man in the back seat of the black Dodge Charger.

30

e.      The men in the black Dodge Charger called over to John Doe #4 and he approached the vehicle.   The men then asked John Doe #4 about the whereabouts of John Doe #3.   John Doe #4 stated that he had tried to call John Doe #3 several times to no avail.   The men then demanded that John Doe #4 call John Doe #3 in front of them.   When John Doe #4 protested, REDINAL DERVISHAJ pulled John Doe #4's head towards the vehicle and punched John Doe #4 in the face.   Thereafter, the man in the back seat of the Dodge Charger got out of the vehicle and put a gun to John Doe #4's head.   DENIS NIKOLLA and REDINEL DERVISHAJ also exited the vehicle.   Eventually, NIKOLLA and DERVISHAJ re-entered the vehicle and the third man put his gun in his waistband, attempted to calm John Doe #4 down and spoke with John Doe #4.   Among other things, the man told John Doe #4 that their problem was with John Doe #3 and not to make him come back to deal with this problem.

57.      Telephone calls intercepted during a court-authorized wiretap of the DERVISHAJ Cell Phone, which began on August 7, 2013, corroborate information provided by John Doe #3 and John Doe #4.    For example, at approximately 3:15 pm on August 7, 2013, DERVISHAJ received an incoming call (Session 206) from Vasilikia Vjeri, an individual who works at a social club operated by her husband in the vicinity of Social Club 2. During the call, Vjeri informed DERVISHAJ that she heard from someone "yesterday afternoon" that "the dirty person" – an apparent reference to John Doe #4 – was beaten up. Thereafter, DERVISHAJ asked Vjeri whether she knew if "they have closed or opened it" – an apparent reference to Social Club 2.   Vjeri indicated that "it" was open, as she sent someone there.   Among other things, Vjeri told DERVISHAJ that "the faggot has disappeared.   He has not been seen anywhere" – an apparent reference to John Doe #3.

31

58.     Thereafter, at approximately 3:23 pm on August 7, 2013, DERVISHAJ placed an outgoing call to SUBJECT TELEPHONE 1 (Session 208).   During the call, DERVISHAJ informed NIKOLLA that he had been told that "the place is open and people have gone there."   NIKOLLA expressed disbelief and the two agreed to meet later that day.

59.     On August 8, 2013, at approximately 3:47 pm, DERVISHAJ received an incoming call from telephone number 646-764-4283 (Session 301).   During the call, NIKOLLA informed DERVISHAJ that he had heard from others that John Doe #3 had fled to Cyprus.   NIKOLLA further informed DERVISHAJ that he had gone to Social Club 2 and demanded that "the gray hair man that is in charge" give him the keys to Social Club 2 and, further, told the employee: "when you want to open it [Social Club 2], tell [John Doe #3] to call me."

60.     Based upon the above proffer, the government requests that the Court issue Orders that provide, pursuant to 18 U.S.C. § 2703(c)(1) and (d), a directive to the service provider to supply within seven days (1) the HISTORICAL CELL-SITE INFORMATION for SUBJECT TELEPHONE 1 for the period from July 1, 2013 to August 23, 2013; and (2) the HISTORICAL CELL-SITE INFORMATION for SUBJECT TELEPHONE 2 for the period from August 1, 2013 to August 23, 2013.

61.     The government also requests that the service provider, and any other person or entity whose assistance is used to facilitate execution of the Orders be ordered not to disclose (a) the existence of the Order of Authorization; (b) the existence of the Order to Service Provider and (c) the production of the HISTORICAL CELL-SITE INFORMATION, to the listed subscribers for SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 (collectively, the "SUBJECT TELEPHONES"), the subscribers of the telephones initiating incoming calls to or receiving outgoing calls from the SUBJECT TELEPHONES, or to any other person, unless and until otherwise ordered by the Court.   Any such disclosure might result in the destruction of or tampering with evidence and risk intimidation of potential witnesses.

62.     No prior request for the relief set forth herein has been made except to the extent set forth above.   The foregoing is affirmed under the penalties of perjury.   *See* 28 U.S.C. § 1746.

Dated: Brooklyn, New York
        September 12, 2014

_____
Nadia I. Shihata
Assistant United States Attorney
(718) 254-6295

**14 MISC 1117**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION      SEALED ORDER
OF THE UNITED STATES OF AMERICA    OF AUTHORIZATION
FOR AN ORDER AUTHORIZING THE RELEASE
OF HISTORICAL CELL-SITE INFORMATION

- - - - - - - - - - - - - - - - - -X

This matter having come before the Court pursuant to an application by

Assistant United States Attorney Nadia I. Shihata, an attorney for the Government as defined

by Rule 1(b)(1) of the Federal Rules of Criminal Procedure and a duly-authorized

representative of a "governmental entity" under 18 U.S.C. § 2703(c) and (d), requesting

Orders pursuant to 18 U.S.C. § 2703(c)(1) and (d), directing that within seven days Sprint (the

"service provider") (1) recorded information identifying the base station towers and sectors

that received transmissions from (516) 423-1788, a telephone issued by the service provider

and subscribed to by DENIS NIKOLLA at 161 Utica Avenue, Apartment 2G, Brooklyn, New

York 11213 ("SUBJECT TELEPHONE 1"), at the beginning and the end of calls or text

message transmissions, and the mobile switching center serving SUBJECT TELEPHONE 1

during any calls or text message transmissions, for the period from May 1, 2013 through

August 23, 2013; and (2) recorded information identifying the base station towers and sectors

that received transmissions from (516) 423-3813, a telephone issued by the service provider

and subscribed to by DENIS NIKOLLA at 161 Utica Avenue, Apartment 2G, Brooklyn, New

York 11213 ("SUBJECT TELEPHONE 2"), at the beginning and the end of calls or text

message transmissions, and the mobile switching center serving SUBJECT TELEPHONE 2

during any calls or text message transmissions, for the period from August 1, 2013 through

August 23, 2013 (collectively, the "HISTORICAL CELL-SITE INFORMATION");

UPON REVIEW OF THE APPLICATION, THE COURT HEREBY FINDS

THAT:

Pursuant to 18 U.S.C. § 2703(c)(1) and (d), the government has offered specific

and articulable facts showing that there are reasonable grounds to believe that the

HISTORICAL CELL-SITE INFORMATION is relevant and material to an ongoing criminal

investigation into possible violations of federal criminal laws, including extortion offenses in

violation of 21 U.S.C. § 1951, and use of firearms in connection with these crimes of violence,

in violation of 18 U.S.C. § 924(c) , being conducted by the Federal Bureau of Investigation

(the "investigative agency"); now therefore,

IT IS HEREBY ORDERED, pursuant to 18 U.S.C. § 2703(c)(1) and (d), that

the service provider shall supply to the investigative agency within seven days (1) the

HISTORICAL CELL-SITE INFORMATION for SUBJECT TELEPHONE 1 for the period

from May 1, 2013 to August 23, 2013; and (2) the HISTORICAL CELL-SITE

INFORMATION for SUBJECT TELEPHONE 2 for the period from August 1, 2013 to

August 23, 2013;

Good cause having been shown, IT IS FURTHER ORDERED, that this Order and the application be sealed until otherwise ordered by the Court, and that the service provider, its representatives, agents and employees, and any other person or entity involved in facilitating this Order shall not disclose in any manner, directly or indirectly, by any action or inaction, the existence of this Order, the existence of the Order to Service Provider or the production of the HISTORICAL CELL-SITE INFORMATION to the listed subscribers for the SUBJECT TELEPHONES, the subscribers of the telephones initiating incoming calls to or receiving outgoing calls from the SUBJECT TELEPHONES, or to any other person.

Dated: Brooklyn, New York
        September 12, 2014

                                _s/Lois Bloom_____
                                THE HONORABLE LOIS BLOOM
                                UNITED STATES MAGISTRATE JUDGE
                                EASTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

# 14 MISC 1117

- - - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION OF
THE UNITED STATES OF AMERICA FOR AN
ORDER AUTHORIZING THE RELEASEOF
HISTORICAL CELL-SITE INFORMATION

SEALED ORDER TO
SERVICE PROVIDER

- - - - - - - - - - - - - - - - -X

WHEREAS this Court has, upon the application of the United States of

America, entered an Order pursuant to 18 U.S.C. § 2703(c)(1) and (d), directing that within

seven days Sprint (the "service provider") disclose (1) recorded information identifying the

base station towers and sectors that received transmissions from (516) 423-1788, a telephone

issued by the service provider and subscribed to by DENIS NIKOLLA at 161 Utica Avenue,

Apartment 2G, Brooklyn, New York 11213 ("SUBJECT TELEPHONE 1"), at the beginning

and the end of calls or text message transmissions, and the mobile switching center serving

SUBJECT TELEPHONE 1 during any calls or text message transmissions, for the period from

May 1, 2013 through August 23, 2013; and (2) recorded information identifying the base

station towers and sectors that received transmissions from (516) 423-3813, a telephone issued

by the service provider and subscribed to by DENIS NIKOLLA at 161 Utica Avenue,

Apartment 2G, Brooklyn, New York 11213 ("SUBJECT TELEPHONE 2"), at the beginning

and the end of calls or text message transmissions, and the mobile switching center serving

SUBJECT TELEPHONE 2 during any calls or text message transmissions, for the period from

August 1, 2013 through August 23, 2013 (collectively, the "HISTORICAL CELL-SITE

INFORMATION");

NOW, THEREFORE, IT IS HEREBY:

ORDERED, pursuant to 18 U.S.C. § 2703(c)(1) and (d), that the service provider shall supply within seven days (1) the HISTORICAL CELL-SITE INFORMATION for SUBJECT TELEPHONE 1 for the period from May 1, 2013 to August 23, 2013; and (2) the HISTORICAL CELL-SITE INFORMATION for SUBJECT TELEPHONE 2 for the period from August 1, 2013 to August 23, 2013;

IT IS FURTHER ORDERED that this Order shall be sealed until otherwise ordered by the Court, except that copies may be retained by the United States Attorney's Office, the Federal Bureau of Investigation, the service provider and any other person or entity whose assistance is used to execute this Order; and

IT IS FURTHER ORDERED that unless and until otherwise ordered by the Court, the service provider and its representatives, agents and employees, and any other person or entity providing technical assistance in executing this Order shall not disclose until further notice in any manner, directly or indirectly, by any action or inaction, the existence of the this Order or the production of the HISTORICAL CELL-SITE INFORMATION, to the listed subscriber for the SUBJECT TELEPHONES, the subscribers of the telephones initiating incoming calls to or receiving outgoing calls from the SUBJECT TELEPHONES, or to any other person.

Dated: Brooklyn, New York
       September 12, 2014

                                        s/Lois Bloom
                                        _____
                                        THE HONORABLE LOIS BLOOM
                                        UNITED STATES MAGISTRATE JUDGE
                                        EASTERN DISTRICT OF NEW YORK